ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X
                                :
UNITED STATES OF AMERICA        :
                                :         **SEALED INDICTMENT**
     - v. -                     :
                                :         19 Cr. ____
MOAZU KROMAH,                   :
     a/k/a "Ayoub,"            :
     a/k/a "Ayuba,"            :
     a/k/a "Kampala Man,"       **19 CRIM 338**
AMARA CHERIF,                   :
     a/k/a "Bamba Issiaka,"     :
MANSUR MOHAMED SURUR,           :       ┌─────────────────────────┐
     a/k/a "Mansour,"          :       │ USDC SDNY               │
ABDI HUSSEIN AHMED,             :       │ DOCUMENT                │
     a/k/a "Abu Khadi,"         :       │ ELECTRONICALLY FILED    │
                                :       │ DOC #:                  │
          Defendants.           :       │ DATE FILED: 5/7/19      │
- - - - - - - - - - - - - - - - X       └─────────────────────────┘

## COUNT ONE

### (Conspiracy to Commit Wildlife Trafficking)

The Grand Jury charges:

### Overview of the Conspiracy

1.   At all times relevant to this Indictment, MOAZU

KROMAH, a/k/a "Ayoub," a/k/a "Ayuba," a/k/a "Kampala Man," AMARA

CHERIF, a/k/a "Bamba Issiaka," MANSUR MOHAMED SURUR, a/k/a

"Mansour," and ABDI HUSSEIN AHMED, a/k/a "Abu Khadi," the

defendants, and others known and unknown, were members of a

transnational criminal enterprise (the "Enterprise") based in

the Republic of Uganda ("Uganda"), and surrounding countries,

which was engaged in the large-scale trafficking and smuggling

of rhinoceros horns and elephant ivory.

2.     From at least in or about December 2012 through at
least in or about May 2019, MOAZU KROMAH, a/k/a "Ayoub," a/k/a
"Ayuba," a/k/a "Kampala Man," AMARA CHERIF, a/k/a "Bamba
Issiaka," MANSUR MOHAMED SURUR, a/k/a "Mansour," and ABDI
HUSSEIN AHMED, a/k/a "Abu Khadi," the defendants, and others
known and unknown, conspired to transport, distribute, sell, and
smuggle at least approximately 190 kilograms of rhinoceros horns
and at least approximately 10 tons of elephant ivory from or
involving various countries in East Africa, including Uganda,
the Democratic Republic of the Congo (the "DRC"), the Republic
of Guinea ("Guinea"), the Republic of Kenya ("Kenya"), the
Republic of Mozambique ("Mozambique"), the Republic of Senegal
("Senegal"), and the United Republic of Tanzania ("Tanzania"),
to buyers located in the United States and countries in
Southeast Asia.  Such weights of rhinoceros horn and elephant
ivory are estimated to have involved the illegal poaching of
more than approximately 35 rhinoceros and more than 100
elephants.  In total, the estimated average retail value of the
rhinoceros horn involved in the conspiracy was at least
approximately $3.4 million, and the estimated average retail
value of the elephant ivory involved in the conspiracy was at
least approximately $4 million.

2

## Relevant Individuals

3. At all times relevant to this Indictment, MOAZU KROMAH, a/k/a "Ayoub," a/k/a "Ayuba," a/k/a "Kampala Man," the defendant, was a citizen of the Republic Of Liberia, and resided in Kampala, Uganda.

4. At all times relevant to this Indictment, AMARA CHERIF, a/k/a "Bamba Issiaka," the defendant, was a citizen of the Republic of Guinea, and resided in Conakry, Guinea.

5. At all times relevant to this Indictment, MANSUR MOHAMED SURUR, a/k/a "Mansour," the defendant, was a citizen of Kenya, and resided in Mombasa, Kenya.

6. At all times relevant to this Indictment, ABDI HUSSEIN AHMED, a/k/a "Abu Khadi," the defendant, was a citizen of Kenya, and resided in Mombasa, Kenya.

## Regulation of Trade Involving Endangered Species

7. In the United States, trade involving endangered or threatened species is regulated under several statutes, as well as international treaties implemented by certain domestic laws.

8. The Endangered Species Act, 16 U.S.C. § 1531 *et seq.* ("ESA"), makes it a crime to deliver, receive, carry, transport, ship, sell and offer for sale in interstate or foreign commerce, any endangered wildlife species. 16 U.S.C. § 1538(a)(1)(E) & (F). The ESA also makes it a crime to attempt to commit, solicit another to commit, or cause to be committed, an ESA

3

violation. 16 U.S.C. § 1538(g). Under the ESA, the term "endangered species" includes any species in danger of extinction throughout all or a significant portion of its range. 16 U.S.C. § 1532(6). All species of wildlife determined to be endangered within the meaning of the ESA are listed in Title 50, Code of Federal Regulations, Section 17.11.

9.     Under the ESA, three species of wildlife relevant to this Indictment are afforded endangered species status:

a.     Black rhinoceros (*Diceros bicornis*), which is native to Eastern and Southern Africa, has been listed as an endangered species in the United States since at least in or about 1980.  Despite the fact that international trade in rhinoceros horn has been highly regulated and largely banned since 1976, horns and items carved from those horns remain highly valued commodities.  Rhinoceros horn is also used to make ornamental carvings that are highly valued in Asian countries as well as in the United States.  Demand also stems from the use of such horns to make libation cups later marketed as antiques. And in certain Asian countries, rhinoceros horn is worth more than gold because of beliefs that it can cure various ailments and illnesses.  The escalating value of these items has resulted in an increased demand for rhinoceros horn and helped to foster a thriving black market.  As a result, most species of rhinoceros are extinct or on the brink of extinction.  The black

4

rhinoceros population is estimated to be no more than
approximately 5,500 worldwide.

b.      White rhinoceros (*Ceratotherium simum*), which is
native to Central and Southern Africa, is the largest extant
species of rhinoceros.  The white rhinoceros has been listed as
an endangered species in the United States since at least in or
about 1980, but - like the black rhinoceros - the escalating
value of its horns and items carved from those horns has
resulted in an increased demand for rhinoceros horn and helped
to foster a thriving black market.  The white rhinoceros
population is estimated to be no more than approximately 21,000
worldwide.

c.      African elephants (*Loxodonta Africana*) have been
listed as a threatened species under the ESA since at least in
or about 1978.  Like rhinoceros horn, elephant ivory and carved
art objects made from such ivory are also highly sought-after
commodities despite the fact that international trade in
elephant ivory has been highly regulated and largely banned over
four decades.  The demand for antiques and art derived from or
containing elephant ivory, including modern carvings often sold
as antiques, has also resulted in a thriving black market.  As a
result, African elephants are threatened in many countries and
the total population is estimated to be no more than
approximately 415,000 worldwide.

10.   The ESA and regulations promulgated thereunder also implement certain international treaties that protect fish, wildlife, and plants that are or may become imperiled due to demand in international markets, including the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"). *See* 16 U.S.C. § 1538(c); 50 C.F.R. Parts 14 and 23.   More than 180 countries, including the United States, the DRC, Guinea, Kenya, Mozambique, Senegal, and Tanzania, are parties to CITES, which has regulated trade in rhinoceros horn and elephant ivory since at least in or about 1976.   A species protected under CITES cannot be imported to or exported from the United States without prior notification to, and official approval from, the United States Fish and Wildlife Service ("USFWS").   50 C.F.R. §§ 23.13, 23.20.

11.   Species protected by CITES are listed in a series of appendices, which are labelled Appendices I, II, and III.   A species listed in Appendix I may be exported from a foreign country to the United States only if, prior to exportation, the exporter possesses a valid foreign export permit from the country of export and a valid import permit issued by the United States.   50 C.F.R. §§ 23.13, 23.20 and 23.35.   Under Appendix II, a species may be exported from a foreign country to the United States only if, prior to exportation, the exporter possesses a CITES export permit issued by the country of export.

6

All rhinoceros and elephant species are protected under either CITES Appendix I or II.

12.    In addition to the ESA, the Lacey Act, 16 U.S.C. § 3371 *et seq.* (the "Lacey Act"), makes it a crime to, *inter alia*, knowingly import, export, transport, sell, receive, acquire, and purchase or attempt to import, export, transport, sell, receive, acquire, and purchase, in interstate and foreign commerce, wildlife having a market value in excess of $350, while knowing that said wildlife has been taken, possessed, transported, and sold in violation of any foreign law. *See* 16 U.S.C. §§ 3372(a)(2)(A) and 3373(d)(1).

13.    Rhinoceros and elephant species are also protected under various laws of foreign countries, including the Uganda Wildlife Act, the Kenya Wildlife Conservation and Management Act and Kenya East Africa Customs Act, the Tanzania Wildlife Conservation Act, the Mozambique Forest and Wildlife Act and Mozambique Law No. 16/2014, and the DRC 11 February 2014 Nature Conservation Act.

### Means and Methods of the Wildlife Trafficking Conspiracy

14.    The means and methods by which MOAZU KROMAH, a/k/a "Ayoub," a/k/a "Ayuba," a/k/a "Kampala Man," AMARA CHERIF, a/k/a "Bamba Issiaka," MANSUR MOHAMED SURUR, a/k/a "Mansour," and ABDI HUSSEIN AHMED, a/k/a "Abu Khadi," the defendants, sought to

accomplish the illegal objects and purposes of the conspiracy included, among others, the following:

a.       KROMAH, CHERIF, SURUR, and AHMED purchased, received, acquired, and traded, and attempted to purchase, receive, acquire, and trade, black and white rhinoceros horns (collectively, "rhinoceros horns") and elephant ivory, in interstate and foreign commerce.

b.       KROMAH, CHERIF, SURUR, and AHMED exported, transported, and sold, and attempted to export, transport, and sell, rhinoceros horns and elephant ivory to foreign buyers, including those represented to be in Manhattan, in packaging that concealed the rhinoceros horns and elephant ivory in, among other things, pieces of art such as African masks and statues.

c.       KROMAH, CHERIF, SURUR, and AHMED received and deposited payment from foreign customers in the form of international wire transfers, some which were sent through U.S. financial institutions, deposits into foreign bank accounts, and cash.

## Statutory Allegations

15.    From at least in or about 2012 through at least in or
about May 2019, in the Southern District of New York and
elsewhere, MOAZU KROMAH, a/k/a "Ayoub," a/k/a "Ayuba," a/k/a
"Kampala Man," AMARA CHERIF, a/k/a "Bamba Issiaka," MANSUR
MOHAMED SURUR, a/k/a "Mansour," and ABDI HUSSEIN AHMED, a/k/a
"Abu Khadi," the defendants, who will first be brought to and
arrested in the Southern District of New York, and others known
and unknown, willfully and knowingly did combine, conspire,
confederate, and agree together and with each other, to commit
offenses against the United States, to wit, violations of Title
16, United States Code, Sections 1538(a)(1)(F), 1540(b)(1),
3372(a)(2)(A), 3373(d)(1)(B), 3372(d)(2), and 3373(d)(3)(A)(ii).

16.    It was a part and object of the conspiracy that MOAZU
KROMAH, a/k/a "Ayoub," a/k/a "Ayuba," a/k/a "Kampala Man," AMARA
CHERIF, a/k/a "Bamba Issiaka," MANSUR MOHAMED SURUR, a/k/a
"Mansour," and ABDI HUSSEIN AHMED, a/k/a "Abu Khadi," the
defendants, and others known and unknown, would and did
knowingly import, export, transport, sell, receive, acquire, and
purchase wildlife with a market value in excess of $350, to wit,
CITES-protected rhinoceros horns and elephant ivory, in
interstate and foreign commerce, knowing that such wildlife was
taken, possessed, transported, and sold in violation of foreign
law, namely the Uganda Wildlife Act, the Kenya Wildlife

9

Conservation and Management Act and Kenya East Africa Customs Act, the Tanzania Wildlife Conservation Act, the Mozambique Forest and Wildlife Act and Mozambique Law No. 16/2014, and the DRC 11 February 2014 Nature Conservation Act, in violation of Title 16, United States Code, Sections 3372(a)(2)(A) and 3373(d)(1)(B).

17.   It was further a part and object of the conspiracy that MOAZU KROMAH, a/k/a "Ayoub," a/k/a "Ayuba," a/k/a "Kampala Man," AMARA CHERIF, a/k/a "Bamba Issiaka," MANSUR MOHAMED SURUR, a/k/a "Mansour," and ABDI HUSSEIN AHMED, a/k/a "Abu Khadi," the defendants, and others known and unknown, would and did knowingly make and submit a false record, account, and label for, and a false identification of, wildlife, to wit, CITES-protected rhinoceros horns and elephant ivory, which was intended to be transported in interstate and foreign commerce, and was involved in the sale and purchase, offer of sale and purchase, and commission of an act with intent to sell and purchase wildlife with a market value greater than $350, in violation of Title 16, United States Code, Sections 3372(d)(2) and 3373(d)(3)(A)(ii).

18.   It was further a part and object of the conspiracy that MOAZU KROMAH, a/k/a "Ayoub," a/k/a "Ayuba," a/k/a "Kampala Man," AMARA CHERIF, a/k/a "Bamba Issiaka," MANSUR MOHAMED SURUR, a/k/a "Mansour," and ABDI HUSSEIN AHMED, a/k/a "Abu Khadi," the

10

defendants, and others known and unknown, would and did knowingly sell and offer for sale endangered species of wildlife, to wit, rhinoceros horns, in interstate and foreign commerce, in violation of Title 16, United States Code, Sections 1538(a)(1)(F) and 1540(b)(1).

## Overt Acts

19.  In furtherance of the conspiracy, and to effect the illegal objects thereof, MOAZU KROMAH, a/k/a "Ayoub," a/k/a "Ayuba," a/k/a "Kampala Man," AMARA CHERIF, a/k/a "Bamba Issiaka," MANSUR MOHAMED SURUR, a/k/a "Mansour," and ABDI HUSSEIN AHMED, a/k/a "Abu Khadi," the defendants, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.  On a number of occasions, KROMAH, SURUR, and AHMED met with a confidential source ("CS-1"), both together and separately, concerning potential purchases of elephant ivory and rhinoceros horn. During these meetings and at other times via phone calls and an electronic messaging application, CS-1 discussed with KROMAH, SURUR, and AHMED, in substance and in part, the terms of the sale, including the price, weight or size of the rhinoceros horns, payment, destination, and delivery options.  CS-1 also discussed with CHERIF via phone calls and electronic messages, in substance and in part, the terms of the

11

sales, as well as how to send payment for the rhinoceros horns from a United States bank account located in Manhattan.

b. In particular, in or about July 2017, CS-1 met with SURUR in Kenya. SURUR offered, in substance and in part, to sell CS-1 four rhinoceros horns represented to weigh approximately 4.2 kilograms for approximately $61,500 in United States currency. During the meeting with SURUR, CS-1 obtained a picture of the horns being offered for sale.

c. On or about November 21, 2017, CS-1 met with SURUR, KROMAH, and AHMED in Uganda. During that meeting, in substance and in part, KROMAH (i) represented that he had elephant ivory available for purchase by CS-1; (ii) agreed to arrange shipping of elephant ivory for CS-1; (iii) quoted a price per kilogram in United States currency for shipping the ivory; and (iv) informed CS-1 that actual payment terms would be decided by CHERIF.

d. On or about February 11, 2018, CS-1 again met with SURUR, KROMAH, and AHMED in Uganda. In substance and in part, CS-1 asked to purchased black rhinoceros horn, and inquired whether the defendants could ship the horn to Dakar, Senegal, where it would then be transported by others to a buyer in Manhattan. KROMAH agreed to arrange the shipment of the rhinoceros horn. Following that meeting, CS-1 spoke with CHERIF via telephone. During the call, CS-1 confirmed with CHERIF that

12

KROMAH would ship the rhinoceros horn to Senegal, with a final destination in Manhattan. CHERIF confirmed, in substance and in part, that he understood the rhinoceros horn ultimately was being sent to "Chinatown in New York" in the "United States of America," and CHERIF assured CS-1 that was "[n]o problem."

e. On or about February 15, 2018, CS-1 exchanged several electronic messages with SURUR. Those messages included, in substance and in part, images of a rhinoceros horn ("Horn-1") represented to weigh approximately 1 kilogram, which SURUR represented was available for purchase by CS-1, to wit:



f. On or about February 15, 2018, CS-1 sent an electronic message to CHERIF, which stated, in substance and in part, that SURUR had "sent [CS-1] the pics of the 1 [kilogram]" rhinoceros horn, and that "[t]he client has the money in a bank

13

in Manhattan New York."  CS-1 asked CHERIF, in substance and in part, to "[s]end [CS-1] the details of the bank account where [the client] can transfer the money".

        g.    On or about March 2, 2018, CS-1 met SURUR and AHMED to provide payment for Horn-1.  During the meeting, among other things, CS-1 provided SURUR and AHMED with approximately $18,000 in United States currency as payment for Horn-1, as well as approximately $1,500 in United States currency as commission for SURUR and AHMED.

        h.    On or about March 3, 2018, CS-1 exchanged additional electronic messages with CHERIF and SURUR concerning the purchase of Horn-1.  Both CHERIF and SURUR sent CS-1 messages that included, among other things, an image of a shipping document concerning a particular package ("Package-1"). SURUR also sent CS-1 an electronic message that included, among other things, an image of an African mask, and that stated, in substance and in part, "It is in the yellow head."

        i.    On or about March 16, 2018, law enforcement agents intercepted Package-1.  Consistent with the messages from SURUR, the agents found that Package-1 contained, among other things, an African mask in which Horn-1 was concealed.  USFWS agents obtained a photograph of Horn-1, to wit:

14



A USFWS forensics laboratory examined Horn-1 and concluded that
Horn-1 was a black rhinoceros horn.

j.    From in or about March 2018 through in or about
May 2018, the defendants offered to sell CS-1 additional
rhinoceros horns of varying weights, including horns weighing up
to seven kilograms.  For example, on or about March 22, 2018,
CHERIF sent messages to CS-1 that included two images of
rhinoceros horns represented to weigh a total of approximately
6.8 kilograms, which SURUR represented was available for
purchase by CS-1.  As another example, on or about March 31,
2018, SURUR sent a message to CS-1 that included an image of a
single rhinoceros horn represented to weigh approximately 7
kilograms, which SURUR represented was available for purchase by
CS-1.  Below are the images sent to CS-1 by CHERIF and SURUR,
respectively:

  

k.    On or about May 7 and 10, 2018, CS-1 made
payments to purchase two additional rhinoceros horns ("Horn-2"
and "Horn-3") from CHERIF, KROMAH, SURUR, and AHMED for
approximately $94,644 in United States currency, as well as
approximately $1,850 in United States currency paid to SURUR as
a commission.  CS-1 subsequently paid approximately $14,000 in
United States currency in additional commissions to CHERIF,
SURUR, and AHMED.

l.    In or about early July 2018, CS-1 exchanged
electronic messages with CHERIF and SURUR concerning the
purchase of Horn-2 and Horn-3.  Both CHERIF and SURUR sent CS-1
messages that included, among other things, an image of a
shipping document concerning a particular package ("Package-2")
and statues in which Horn-2 and Horn-3 were concealed.

16

m. On or about July 17, 2018, law enforcement agents intercepted Package-2. Consistent with the messages from CHERIF and SURUR, the agents found that Package-2 contained, among other things, statues in which Horn-2 and Horn-3 were concealed. USFWS agents obtained a picture of Horn-2, to wit:



A USFWS forensics laboratory examined Horn-2 and Horn-3, and concluded that they were white rhinoceros horns.

17

n.    From in or about June 2018 through in or about December 2018, the defendants offered to sell CS-1 additional rhinoceros horns of varying weights.  For example, on or about October 1, 2018, SURUR sent an image to CS-1 of a rhinoceros available for purchase by CS-1, to wit:



(Title 18, United States Code, Sections 371 and 3238.)

### COUNT TWO

### (Wildlife Trafficking in Violation of Lacey Act)

The Grand Jury further charges:

20.    The allegations contained in paragraphs 1 through 14, and 19, above are hereby repeated, realleged, and incorporated by reference herein as though fully set forth herein.

21.    From in or about February 2018 though in or about March 2018, in the Southern District of New York and elsewhere,

18

MOAZU KROMAH, a/k/a "Ayoub," a/k/a "Ayuba," a/k/a "Kampala Man,"
AMARA CHERIF, a/k/a "Bamba Issiaka," MANSUR MOHAMED SURUR, a/k/a
"Mansour," and ABDI HUSSEIN AHMED, a/k/a "Abu Khadi," the
defendants, who will first be brought to and arrested in the
Southern District of New York, knowingly imported, exported,
transported, sold, received, acquired, and purchased wildlife
with a market value in excess of $350 in interstate and foreign
commerce, knowing that such wildlife was taken, possessed,
transported, and sold in violation of foreign law, to wit,
KROMAH, CHERIF, SURUR, and AHMED sold or otherwise facilitated
the sale of Horn-1, a black rhinoceros horn, to CS-1 for a buyer
represented to be in Manhattan and the transportation of Horn-1
to Dakar, Senegal, in violation of the Uganda Wildlife Act, and
the Kenya Wildlife Conservation and Management Act and Kenya
East Africa Customs Act.

(Title 16, United States Code, Sections 3372(a)(2)(A) and
3373(d)(1)(B); Title 18 United States Code, Sections 3238 and
2.)

## COUNT THREE

## (Wildlife Trafficking in Violation of Lacey Act)

The Grand Jury further charges:

22.     The allegations contained in paragraphs 1 through 14,
and 19, above are hereby repeated, realleged, and incorporated
by reference herein as though fully set forth herein.

23. From in or about May 2018 through in or about July 2018, in the Southern District of New York and elsewhere, MOAZU KROMAH, a/k/a "Ayoub," a/k/a "Ayuba," a/k/a "Kampala Man," AMARA CHERIF, a/k/a "Bamba Issiaka," MANSUR MOHAMED SURUR, a/k/a "Mansour," and ABDI HUSSEIN AHMED, a/k/a "Abu Khadi," the defendants, who will first be brought to and arrested in the Southern District of New York, knowingly imported, exported, transported, sold, received, acquired, and purchased wildlife with a market value in excess of $350 in interstate and foreign commerce, knowing that such wildlife was taken, possessed, transported, and sold in violation of foreign law, to wit, KROMAH, CHERIF, SURUR, and AHMED sold or otherwise facilitated the sale of Horn-2 and Horn-3, which were white rhinoceros horns, to CS-1 for a buyer represented to be in Manhattan and the transportation of Horn-2 and Horn-3 to Dakar, Senegal, in violation of the Uganda Wildlife Act, and the Kenya Wildlife Conservation and Management Act and Kenya East Africa Customs Act.

(Title 16, United States Code, Sections 3372(a)(2)(A) and 3373(d)(1)(B); Title 18 United States Code, Sections 3238 and 2.)

20

## **COUNT FOUR**

### **(Money Laundering Conspiracy)**

The Grand Jury further charges:

24. The allegations contained in paragraphs 1 through 14, and 19, above are hereby repeated, realleged, and incorporated by reference herein as though fully set forth herein.

25. From at least in or about February 2018 through in or about April 2018, in the Southern District of New York and elsewhere, MOAZU KROMAH, a/k/a "Ayoub," a/k/a "Ayuba," a/k/a "Kampala Man," AMARA CHERIF, a/k/a "Bamba Issiaka," and MANSUR MOHAMED SURUR, a/k/a "Mansour," the defendants, who will first be brought to and arrested in the Southern District of New York, and others known and unknown, knowingly and intentionally did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Sections 1956(a)(3)(A) and 1956(a)(3)(B).

26. It was a part and an object of the conspiracy that MOAZU KROMAH, a/k/a "Ayoub," a/k/a "Ayuba," a/k/a "Kampala Man," AMARA CHERIF, a/k/a "Bamba Issiaka," and MANSUR MOHAMED SURUR, a/k/a "Mansour," the defendants, and others known and unknown, would and did conduct and attempt to conduct financial transactions involving property represented at the direction of, or with the approval of, a federal law enforcement officer, to be proceeds of specified unlawful activity, to wit, narcotics

21

trafficking, in violation of Title 21, United States Code, Sections 841 and 846, with the intent to promote the carrying on of specified unlawful activity, to wit, the sale and offer for sale in interstate and foreign commerce of any endangered species of wildlife, in violation of Title 16, United States Code, Section 1538(a)(1)(F), all in violation of Title 18, United States Code, Section 1956(a)(3)(A) & (c)(7)(B)(i) & (G).

27.   It was further a part and an object of the conspiracy that AMARA CHERIF, a/k/a "Bamba Issiaka," and MANSUR MOHAMED SURUR, a/k/a "Mansour," the defendants, and others known and unknown, would and did conduct and attempt to conduct financial transactions involving property represented at the direction of, or with the approval of, a federal law enforcement officer, to be proceeds of specified unlawful activity, to wit, narcotics trafficking, in violation of Title 21, United States Code, Sections 841 and 846, with the intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, to wit, the sale and offer for sale in interstate and foreign commerce of any endangered species of wildlife, in violation of Title 16, United States Code, Section 1538(a)(1)(F), all in violation of Title 18, United States Code, Section 1956(a)(3)(B) & (c)(7)(B)(i) & (G).

22

## Overt Acts

28. In furtherance of the conspiracy, and to effect the illegal object thereof, MOAZU KROMAH, a/k/a "Ayoub," a/k/a "Ayuba," a/k/a "Kampala Man," AMARA CHERIF, a/k/a "Bamba Issiaka," and MANSUR MOHAMED SURUR, a/k/a "Mansour," the defendants, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a. From in or about February 2018 through in or about April 2018, CHERIF, KROMAH, and SURUR undertook to facilitate and conceal payments by CS-1 for rhinoceros horn, which payments were made from a United States bank account represented to contain narcotics proceeds.

b. In particular, on or about February 13, 2018, CS-1 spoke with CHERIF via telephone regarding payment for Horn-1. CS-1 told CHERIF, in substance and in part, that the bank account from which CS-1 would pay for the rhinoceros horn was an account funded by narcotics proceeds, and that CS-1 didn't "want to burn that account" and "want[ed] to keep that account free from problems."

c. On or about February 14, 2018, CS-1 met with KROMAH, SURUR, and AHMED in Uganda. CS-1 told KROMAH, in substance and in part, that CHERIF had informed CS-1, in substance and in part, that CHERIF had a way to transfer money from CS-1's bank account in New York for the purchase of Horn-1.

23

KROMAH responded, in substance and in part, that CHERIF had
called him previously and that "[h]e already told me."

    d.    On or about February 15, 2018, CS-1 sent an
electronic message to CHERIF, which stated, in substance and in
part, that SURUR had "sent [CS-1] the pics of the 1 [kilogram]"
rhinoceros horn, and that "[t]he client has the money in a bank
in Manhattan New York."  CS-1 asked CHERIF, in substance and in
part, to "[s]end . . . details of the bank account where [the
client] can transfer the money."  On or about that same day,
SURUR sent CS-1 an electronic message that explained, in
substance and in part, that SURUR had "talked to [CHERIF]" and
that CHERIF had "advised [SURUR] how to get the money."

    e.    From in or about February 21, 2018, through March
1, 2018, law enforcement agents wired funds withdrawn from a
bank account located in the Southern District of New York
("Account-1") to CS-1 and an associate of CS-1 ("Individual-1")
in Kenya.  On or about March 2, 2018, CS-1 met SURUR and AHMED
to provide payment for Horn-1 using funds transferred from
Account-1.

    f.    On or about April 10, 2018, CS-1 spoke to CHERIF
via telephone and discussed, in substance and in part, the
manner in which CS-1 could pay for additional rhinoceros horn
purchases.  During that call, CHERIF told CS-1, in substance and
in part, that he had contacts at a money transfer business in

24

the United States ("Business-1"), which CHERIF believed would disguise a payment sent by CS-1 from the United States to Kenya. Shortly thereafter, in or about late April 2018, SURUR provided CS-1 with a document addressed to Business-1, which falsely described a proposed payment of approximately $375,400.00 in United States currency as a payment for the purchase of real estate in Kenya. In truth, $375,400 was the price at which the defendants were attempting to sell CS-1 additional rhinoceros horn.

(Title 18, United States Code, Sections 1956(h) and 3238.)

## COUNT FIVE

### (Narcotics Conspiracy)

The Grand Jury further charges:

29. The allegations contained in paragraphs 3 through 6 above are hereby repeated, realleged, and incorporated by reference herein as though fully set forth herein.

30. From at least in or about August 2018 through at least in or about May 2019, MANSUR MOHAMED SURUR, a/k/a "Mansour," and ABDI HUSSEIN AHMED, a/k/a "Abu Khadi," the defendants, conspired to distribute and possess with intent to distribute more than approximately ten kilograms of heroin to a buyer represented to be located in New York.

31. From at least in or about August 2018 through at least in or about May 2019, in the Southern District of New York and

elsewhere, MANSUR MOHAMED SURUR, a/k/a "Mansour," and ABDI HUSSEIN AHMED, a/k/a "Abu Khadi," the defendants, who will first be brought to and arrested in the Southern District of New York, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

32. It was a part and an object of the conspiracy that MANSUR MOHAMED SURUR, a/k/a "Mansour," and ABDI HUSSEIN AHMED, a/k/a "Abu Khadi," the defendants, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

33. The controlled substance that MANSUR MOHAMED SURUR, a/k/a "Mansour," and ABDI HUSSEIN AHMED, a/k/a "Abu Khadi," the defendants, conspired to distribute and possess with the intent to distribute was one kilogram and more of mixtures and substances containing a detectable amount of heroin, in violation of Title 21, United States Code, Section 841(b)(1)(A).

(Title 21, United States Code, Section 846; Title 18, United States Code, Section 3238.)

26

## FORFEITURE ALLEGATIONS

34. As the result of committing the wildlife trafficking offense alleged in Count One of this Indictment, MOAZU KROMAH, a/k/a "Ayoub," a/k/a "Ayuba," a/k/a "Kampala Man," AMARA CHERIF, a/k/a "Bamba Issiaka," MANSUR MOHAMED SURUR, a/k/a "Mansour," and ABDI HUSSEIN AHMED, a/k/a "Abu Khadi," the defendants, shall forfeit to the United States (1) pursuant to Title 16, United States Code, Section 3374(a) and Title 28, United States Code, Section 2461, all wildlife imported, exported, transported, sold, received, acquired, and purchased that was involved in a violation of Title 16, United States Code, Section 3372, and all vessels, vehicles, aircraft, and other equipment used to aid in the importing, exporting, transporting, selling, receiving, acquiring, and purchasing of wildlife that was involved in such violation; and (2) pursuant to Title 16, United States Code, Section 1540(e)(4) and Title 28, United States Code, Section 2461, all wildlife taken, possessed, sold, purchased, offered for sale and purchase, transported, delivered, received, carried, shipped, exported, and imported that was involved in a violation of Title 16, United States Code, Section 1538, and all guns, traps, nets, and other equipment, vessels, vehicles, aircraft, and other means of transportation used to aid the taking, possessing, selling, purchasing, offering for sale or purchase, transporting, delivering, receiving, carrying,

27

shipping, exporting, and importing of any wildlife that was
involved in such violation

35. As the result of committing the wildlife trafficking
offenses alleged in Counts Two and Three of this Indictment,
MOAZU KROMAH, a/k/a "Ayoub," a/k/a "Ayuba," a/k/a "Kampala Man,"
AMARA CHERIF, a/k/a "Bamba Issiaka," MANSUR MOHAMED SURUR, a/k/a
"Mansour," and ABDI HUSSEIN AHMED, a/k/a "Abu Khadi," the
defendants, shall forfeit to the United States, pursuant to
Title 16, United States Code, Section 3374(a) and Title 28,
United States Code, Section 2461, all wildlife imported,
exported, transported, sold, received, acquired, and purchased
that was involved in said offenses, and all vessels, vehicles,
aircraft, and other equipment used to aid in the importing,
exporting, transporting, selling, receiving, acquiring, and
purchasing of wildlife that was involved in said offenses.

36. As a result of committing the money laundering offense
alleged in Count Four of this Indictment, MOAZU KROMAH, a/k/a
"Ayoub," a/k/a "Ayuba," a/k/a "Kampala Man," AMARA CHERIF, a/k/a
"Bamba Issiaka," and MANSUR MOHAMED SURUR, a/k/a "Mansour," the
defendants, shall forfeit to the United States, pursuant to
Title 18, United States Code, Section 982(a)(1), any and all
property, real and personal, involved in said offense, or any
property traceable to such property, including but not limited

28

to a sum of United States currency representing the amount of property involved in said offense.

37.   As the result of committing the narcotics offense alleged in Count Five of this Indictment, MANSUR MOHAMED SURUR, a/k/a "Mansour," and ABDI HUSSEIN AHMED, a/k/a "Abu Khadi," the defendants, shall forfeit to the United States, pursuant to 21 U.S.C. § 853, any and all property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of said offense and any and all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

## Substitute Asset Provision

38.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(1)   cannot be located upon the exercise of due diligence;

(2)   has been transferred or sold to, or deposited with, a third person;

(3)   has been placed beyond the jurisdiction of the Court;

(4)   has been substantially diminished in value; or

29

(5) has been commingled with other property which

cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C.

§ 981, 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), to seek

forfeiture of any other property of the defendants up to the

value of the above-described forfeitable property.

   (Title 18, United States Code, Sections 981 and 982; Title 21,
   United States Code, Section 853; and Title 28, United States
   Code, Section 2461.)

FOREPERSON

GEOFFREY S. BERMAN
United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

MOAZU KROMAH,
a/k/a "Ayoub,"
a/k/a "Ayuba,"
a/k/a "Kampala Man,"
AMARA CHERIF,
a/k/a "Bamba Issiaka,"
MANSUR MOHAMED SURUR,
a/k/a "Mansour," and
ABDI HUSSEIN AHMED,
a/k/a "Abu Khadi,"

Defendants.

**SEALED INDICTMENT**

19 Cr.

(16 U.S.C. §§ 3372(a)(2)(A) and
3373(d)(1)(B); 18 U.S.C. §§ 371,
1956(h) and 2; 21 U.S.C. § 846.)

GEOFFREY S. BERMAN
United States Attorney

_____
Foreperson

5/7/19

Filed Seaned Indictment
Filed Arrest Warrants
Filed True Bill.

Wong, USMJ