### JEFFREY CHABROWE

─ATTORNEY AT LAW ─
521 FIFTH AVENUE, 17ᵀᴴ FLOOR
NEW YORK, NY 10175
TEL. (917) 529-3921

August 8, 2022

**COURTESY COPY**

The Honorable Gregory Woods, U.S.D.J.
United States District Court
Southern District of New York
500 Pearl Street, Courtroom 12C
New York, New York 10007-1312

Re: <u>United States v. Moazu Kromah</u> 1:S1 19 CR 338-001 (GHW)

Dear Judge Woods:

I represent Moazu Kromah, who is scheduled to be sentenced at 10:00 a.m. on August 18, 2022, and I submit this letter to aid the Court in fashioning an appropriate sentence that is fair to both Mr. Kromah and the government. For the reasons that follow, I respectfully request that the Court sentence Mr. Kromah to a variant sentence of time served.

A.    <u>Background</u>

On March 30, 2022, Mr. Kromah pled guilty before Judge Gregory H. Woods pursuant to a March 30, 2022 plea agreement, to the top three counts of a five-count indictment. PSR, at ¶¶ 11. Count One charged that, from 2012 through May 2019, Mr. Kromah knowingly conspired to traffic in rhinoceros horns and elephant ivory, in violation of 16 U.S.C. §§ 1538(a)(1)(F) and 1540(b)(1) with a value in excess of $350, in violation of 16 U.S.C. §§ 3373(d)(2) and 3373(d)(3)(A)(ii). PSR, at ¶¶ 1-2. Count Two charged that, from February 2018 through March 2018, Mr. Kromah facilitated the sale of black rhinoceros' horn, in violation of 16 U.S.C. §§ 3373(a)(2)(A) and 3373(d)(1)(B). PSR, at ¶¶ 3.

B.    The Presentence Report and the Sentencing Recommendation

Because he conspired to commit wildlife trafficking, Mr. Kromah begins with a U.S.S.G. § 2Q2.1(a) base offense level of 6. PSR, at ¶¶ 59 (citing §§ 2Q2.1(a); 2X1.1). Because he did so in return for money to support his wife, their three children and the three children of his friends whom he beneficently adopted, and the *market* value of the animal parts exceeded $3,500,000, Mr. Kromah receives two-level § 2Q2.2(b)(1)(A) and 18-level § 2Q2.2(b)(3)(A)(ii) enhancements. Id. at ¶¶ 60-61, 82-83. Finally, having played a supervisory role by arranging for shipping, Mr. Kromah suffers a 3-level § 3B1.1(b) offense level increase. See PSR at ¶ 35 (Kromah defers to Cherif on "payment terms"), 48-52 (identifying coconspirators). See also § 3B1.1 Application Note 2 ("§ To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants."). Because he accepted responsibility for his crime through a prompt plea, the Probation Department recommended the full three-level reduction pursuant to § 3E1.1(a, b). PSR at ¶¶ 55-56, 67-68. Thus, according to the Probation Department's calculations, Mr. Kromah's total offense level is 26 and, with no criminal history whatsoever anywhere in the world, Mr. Kromah's guideline range is from 63-78 months of imprisonment. Id. at ¶¶ 69-75, 102.

C.    The § 2B1.1(b)(1) Table Is An Improper Benchmark By Which To Fashion Mr. Kromah's Sentence.

While it is obligated to consider the Guidelines range, "a district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses." United States v. Cavera, 550 F.3d 180, 191 (2d Cir. 2008) (*en banc*) *citing* Kimbrough, 552 U.S. 85, 109 (2007); United States v. Bonilla, 618 F.3d 102, 110 (2d Cir. 2010). Thus, even if this court believes the 18-level § 2Q2.2(b)(3)(A)(ii)  adjustment accurate under the Guidelines, it can find it unjustified if it believes such a one-size-to-fit-all-crimes chart an absurd benchmark by which to apportion punishment across the criminal spectrum. or in atypical circumstances where, for instance *market value* bears little relationship to the gain the defendant actually realized from the offense. See §2Q2.2(b)(3)(A)(ii)( "If the *market value* of the fish, wildlife …(ii) exceeded $6,500, increase by the number of levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud)) Where the "market value" quadrupled the base offense level, elevating the Category I guideline range from 8-14 months to 87-108, the Court should so find the §2B1.1(b)(1) guideline here.

Especially where Mr. Kromah realized but a few percent of it, pinning punishment to the market value greater of the offense's actual or intended loss amount, even pecuniary harm that could not possibly have occurred, Part B of Chapter Two of the United States Sentencing Guidelines, encompassing economic offenses like the instant fraud, has long engendered frustration and fury. See U.S.S.G. §2B1.1 Application Note (3)(A). It was the frequency of anomalous sentences that spawned the ABA's alternative fraud guideline. *Compare* PSR at ¶¶ 34 (reporting that one of the 4 codefendants with

whom Mr. Kromah presumably had to share profits 4.2 kilograms (approximately 9.25 pounds) (https://www.newsweek.com/indian-officials-burn-nearly-2500-rare-rhino-horns-worth-78m-anti-poaching-message-1632050) *with* Sara Santora, *Indian Officials Burn Nearly 2,500 Rare Rhino Horns Worth $78M in Anti-Poaching Message*, Newsweek (September 23, 2021) ("The World Animal Foundation said that on average, a rhino horn is worth $60,000 per pound in Asia." ) *and Rhino horn consumers reveal why a legal trade alone won't save rhinos*, The Conversation (January 20, 2022)("The trade in rhino horn is highly lucrative. In the black market, rhino horn prices can fetch up to $400,000 per kg for Asian rhino horns and $20,000 per kg for African rhino horns.") https://theconversation.com/rhino-horn-consumers-reveal-why-a-legal-trade-alone-wont-save-rhinos-173507 (last visited August 3, 2022)

In United States v. Algahaim, 842 F.3d 796 (2d Cir. 2016), the Second Circuit endorsed an approach encompassing a hard look at the fraud guideline. Id. (while recognizing the Sentencing Commission's prerogative to so formulate the guidelines, finding, where defendants suffered a three-fold increase in base offense level for loss amount, the predominant determinant of adjusted offense level for monetary offenses, that the "unusualness' of such a methodology is a circumstance that a sentencing court is entitled to consider) (citing Kimbrough, 552 U.S. at 101; Cavera, 550 F.3d 180, 192 (same). "Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." Algahaim, 842 F.3d at 800 (citing United States v. Lauersen, 348 F.3d 329, 344 (2d Cir. 2003) (cumulative effect of overlapping enhancements warranted consideration of departure), United States v. Gigante, 94 F.3d 53, 56 (2d Cir. 1996) (same)). See also United States v. Corsey, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J., concurring) (loss enhancement Guideline "fundamentally flawed, especially as loss amounts climb."); United States v. Gupta, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (Rakoff, J.) ("By making a Guidelines sentence turn, for all practical purposes, on [loss enhancement], the Sentencing Commission ... effectively guaranteed that many such sentences would be irrational on their face."); United States v. Emmenegger, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004)(Lynch, J); United States v. Johnson, 2018 WL 1997975. (E.D.N.Y. 2018)(Garaufis, J.)(because "the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime, … I add my name to that lengthy list of judges, practitioners, scholars, and other commentators" who have concluded that loss-drive sentences "do not result from any reasoned determination of how the punishment can best fit the crime).

D.      The § 3553(a) Factors Militate For A Below Guidelines Sentence.

"The court should impose a sentence sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing. U.S.S.G. Chapter 5, Part A, Introductory Commentary citing 18 U.S.C. § 3553(a). "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Pepper v. United States, 562 U.S. 476, 487-88 (2011) (quoting Koon v. United States, 518 U.S. 81, 113 (1996)). In deciding what sentence will be "sufficient, but not greater than necessary" to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must have a "generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." United States v. Singh, 877 F.3d 107, 121 (2017) (quoting Guido Calabresi, What Makes a Judge Great: To A. Leon Higginbotham, Jr., 142 U. Pa. L. Rev. 513, 513 (1993); see also Edward J. Devitt, Ten Commandments for the New Judge, 65 A.B.A. J. 574 (1979), reprinted in 82 F.R.D. 209, 209 (1979) ("Be kind. If we judges could possess but one attribute, it should be a kind and understanding heart. The bench is no place for cruel or callous people regardless of their other qualities and abilities. There is no burden more onerous than imposing sentence in criminal cases."). The punishment should fit the offender and not merely the crime. Pepper v. United States, supra (citing Williams v. NY, 337 U.S. 241, 247 (1949)).

Regulated by, and more serious in, the West, where higher living and educational standards allow the luxury of thinking of other living things, Mr. Kromah nevertheless regrets the offenses. PSR at ¶¶ 19-25, 77-78, 81. See § 3553(a)(1).

As set forth in the PSR at ¶¶ 76-100, his history and characteristics depict a fifty-two-year-old less than secondary-school-educated Liberian in this country solely for his failure to conform to its standards while living without any of its advantages half a world away. PSR at ¶¶ 26, 77, 93. Raised in the most challenging of circumstances without electricity or running water in a rural and impoverished area of Libera, Mr. Kromah and his three older siblings were nevertheless provided a sound upbringing with good values by his taxi-driving father and homemaker mother. Id. at ¶¶ 78, 80, 83. Tragically, no one in power or vying for it shared those same values and Mr. Kromah lost his entire family to the Liberian civil war as a young adult and many friends, as well. PSR at ¶¶ 80, 83. Mr. Kromah only survived the conflict because of his uncle's direct intervention, which compelled him to enter a UN refugee camp in Kohima Guinea exactly one year before the massacre of his village happened. Mr. Kromah stayed at this UN refugee camp at the insistence of his father and with whatever money his uncle could afford to give him. This same refugee camp lacked mosquito nets needed to fend off swarms of mosquitos carrying all sorts of diseases, while the inhabitants of the camp shared small tents, in cramped groups that got as large as five people. During this period, Mr. Kromah fell into a depression and contemplated suicide amidst the loneliness cast by his family's murders.

When Mr. Kromah decided to leave the UN refugee camp in 1911, he began a one-year trek across Africa to the Indian Ocean. He had very little money to his name and carried his few possessions in a small backpack. Mr. Kromah traveled through the Ivory Coast, Ghana, Togo, Benin, Nigeria, Cameroon, Central Africa, and the Democratic

Republic of Congo before arriving in Kampala Uganda in January 1992. He accomplished this journey mainly on foot and sometimes by bus, but always at the mercy of strangers. Mr. Kromah slept in various Mosques in every country that he passed through, and he eventually found employment in a Mosque in Kampala, bringing an end to his journey.

Despite having suffered the most calamitous of personal tragedies, Mr. Kromah has proved admirably resilient, exhibiting considerable industry during his youth in his native country and self-sacrifice, as well, since he came of age. PSR at ¶¶ 83, 96. He demonstrated the same drive while he was in detention, earning a host of certificates through cell study, pandemic lockdown notwithstanding. PSR at ¶¶ 17. Most importantly he has honored the memories of his departed friends as well as the values instilled in him by his devoted parents by stretching his meager resources to their limits in order to adopt and support the orphans of his friends. Id. at 83.

Mr. Kromah is a first-time offender whose recent criminality appears to be an aberration in a heretofore law-abiding life. PSR at ¶¶ 50-52. Having learned his lesson the hardest way, Mr. Kromah does not seem to be a threat to commit further crimes at the conclusion of this, his first period of incarceration. His humanity, ambition, industry, clean disciplinary record and that he lived his first 50 years in a law-abiding fashion suggests that he can do so again. PSR at ¶¶ 6, 47. That his family remains so devoted and supportive confirms Mr. Kromah's values and character. PSR at ¶¶ 82-83. To be sure, Mr. Kromah's recent choice was poor, but it appears to have been dictated by the difficulties of earning a living in his native country and motivated much more by his desire to keep his family out of poverty than by any wanton materialism. Id. at ¶¶ 82-83. As the PSR confirms, Mr. Kromah has never lived a lavish lifestyle and has few personal possessions. PSR, at ¶¶ 97-100. See 18 U.S.C. § 3553(a)(1).

During Mr. Kromah's detention in Uganda, threats were made against him and against his family by the very criminal organizations that had employed him. These threats against his family persisted even after his extradition to the United States. In February 2022, a message was painted on the door of the Kromah family's house that read: "we know where Kromah is, and we want our horns back or we will hurt his family." His family has since gone into hiding in Africa.

Destined to be deported, Mr. Kromah's consistent industry, devotion to family, spotless disciplinary record, and acceptance of responsibility indicate a great potential for rehabilitation and a low likelihood of future criminality. PSR, at ¶¶ 9, 62-63, 70-72, 74-76. They likewise suggest that a below guideline variant sentence of time served would neither deprecate the seriousness of the offense nor undermine respect for the law and would therefore be just. 18 U.S.C. § 3553(a)(2)(A).

Two of Mr. Kromah's coconspirators were apprehended but neither has yet been sentenced. 18 U.S.C. § 3553(a)(6).

E.   <u>Pandemic Pretrial Detention Was Abnormally, And Arguably Even Unduly, Harsh.</u>

In the belief that "it should not rise to the level of punishment" but often does, many courts have cited the severity of pretrial incarceration as justification for downwardly departing from a guidelines range. See United States v. Behr, 2006 WL 1586563 at 5 (S.D.N.Y. June 9, 2006) (citing Bell v. Wolfish, 441 U.S. 520, 537-38 (1979); United States v. Gallo, 653 F.Supp. 320, 336 (E.D.N.Y.1986) (noting that "[t]he inevitable consequences of pretrial incarceration, particularly when prolonged beyond a short period, are undeniably severe."). As long ago as United States. v. Carty, 264 F.3d 191, 196 (2d Cir. 2001), the Second Circuit acknowledged, pre-Booker, that conditions of pre-sentence confinement could be so severe as to warrant a downward departure. To be sure Carty addressed conditions in a Dominican prison and the Court may not have anticipated that those in any American prison could ever rival them, but no one can foresee the future. Here, while the PSR fails to mention it, Mr. Kromah spent 13 months in pre-extradition detention in Uganda in conditions far less humane than those in the developed world. The conditions at this jail were beyond abysmal for the inmates living there as they suffered from food shortages, unless they were able to bribe the guards there, and experienced regular bouts of violence from the guards and the other inmates. Inmates were routinely beaten and mistreated for minor fractions, while no serious efforts were made by the staff at the jail to maintain the hygiene, wellbeing, and health of the inmates living there. See e.g. United States v. Sanpedro, 352 F. App'x 482, 486 (2d Cir. 2009) (summary order) (noting that "[i]n imposing the sentence it did, the district court considered ... [among other factors,] the harsh conditions of [the defendant's] confinement at Combita," in Colombia where he was detained before being extradited to the United States); United States v. Salvador, No. 98 Cr. 484, 2006 WL 2034637, at *4 (S.D.N.Y. July 19, 2006) (holding that defendant's pre-sentence conditions while "incarcerated in the Dominican Republic, awaiting extradition to the United States ... warrant a downward departure"); United States v. Torres, No. 01 Cr. 1078, 2005 WL 2087818, at *2 (S.D.N.Y. Aug. 30, 2005) ("depart[ing] downward, by 1 level, because of the harsh conditions of defendant's pretrial detention").United States v. Hylton, 2016 WL 127550. (E.D.N.Y. January 11, 2016) (credit for 4 months in foreign prison away from family); United States v. Chery, 2016 WL 4491720 (E.D.N.Y. August 25, 2016) (credit for serving 5 months in prison "in a foreign country where he does not speak the language"); United States v. Ramrattan, 2016 WL 4399308 (E.D.N.Y. August 17, 2016) (credit for 3 months in foreign prison).

The COVID-19 pandemic was the worst public health crisis that the world has experienced since 1918. United States v. Plunkett, 2020 WL 5653258 (D. Md. Sept. 23, 2020) (Hollander, J.) (citing United States v. Kromah, ___ F. Supp. 3d ____, 2020 WL 1684062, at 3) (S.D.N.Y. Apr. 2, 2020) ("The COVID-19 pandemic.... presents a clear and present danger to free society for reasons that need no elaboration.")); United States v. Hawkins, 2020 WL 6263449 (D. Md. Oct. 23, 2020) (Hollander, J.)(same). "The pandemic 'has produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." Id. (quoting Cameron v. Bouchard, LVP-20-10949, 2020 WL 2569868, at 1 (E.D. Mich. May 21, 2020), stayed, ─── Fed. App'x ──────, 2020 WL 3100187 (6th Cir. June 11, 2020)). "Indeed, for a significant period of time, life as we have known it came to a halt." Id.

Ultimately over 55,000 federal inmates contracted the virus. 291 died while *in custody. See* https://www.bop.gov/coronavirus/(last *visited August 1, 2022. See* also Maura Turcotte, Rachel Sherman, Rebecca Griesbach and Ann Hinga Klein, *The Real Toll From Prison Covid Cases May Be Higher Than Reported*, The New York Times (July 7, 2021) (prisoners who died in hospitals or immediately post-release may not have been counted).

Not that BOP is bragging about them in the best of times but the consensus now seems to be that the pandemic did cause a substantial deterioration in the conditions of confinement at the federal detention centers. See e.g. Shayna Jacobs, *Judge says 'morons' run New York's federal jails, denounces 'inhuman' conditions,* The Washington Post (May 7, 2021)(in explaining that, but for mandated 5-year minimum term, she would have imposed a time-served sentence in United States v Days, 19-cr-00619 (CM), "U.S. District Court Judge Colleen McMahon castigated the Federal Bureau of Prisons, saying the agency's ineptitude and failure to 'do anything meaningful" at the Metropolitan Correctional Center in Manhattan and the Metropolitan Detention Center in Brooklyn amounted to the "single thing in the five years that I was chief judge of this court that made me the craziest"). See also Noah Goldberg, *Staff, inmates support closing filthy NYC jail where Jeffrey Epstein killed himself,* NY Daily News (Aug 27, 2021)(The Justice Department decided Thursday to close MCC, following years of headline-grabbing problems, including sewage floods, rodent infestations, coronavirus outbreaks and egregious security breaches.); Matt Stieb, *The MCC Is DOA*, NY Magazine (August 26, 2021) (In addition to overcrowding and filthy conditions, reporting crises involving guards' dereliction of duty, sexual abuse of female inmates and a weeklong lockdown after someone never identified smuggled a gun into the jail)

Clearly conditions of confinement throughout the pandemic were far more stressful than during typical times. On extended program-less lockdown, inmates had little family contact, no access to accurate information and had only the occasional cohabitant going by on a gurney from which to extrapolate about the risks they faced and their likelihood of survival. See PSR at §17, 86.

In an attempt to compensate for that systemic psychological stress, most courts have imposed lower sentences post-COVID than they would have in typical times. See e.g. United States v. Cirino, 19-cr-323 (July 17, 2020 SDNY)( where, in sentencing a defendant who had been spared pretrial detention and convicted of conspiracy and attempt to commit Hobbs Act robbery, Judge Rakoff prefaced a significant downward departure by remarking "[I] t is fair to say that conditions in the prison system now result in a harshness that is not the norm and that ought to be recognized by the court as a mitigating factor. In effect, you are serving harder time every day you are in the federal prisons."); United States v. Rodriguez, 00 Cr. 761-2 (JSR), 2020 WL 5810161 at 3 (S.D.N.Y. September 30, 2020)(citing United States v. Al Kassar, 480 F.Supp.3d 582, 583 (S.D.N.Y. Aug. 19, 2020)(aside from posing a threat to health, the pandemic has made "incarceration harsher and more punitive than would otherwise have been the case. This is because the federal prisons, as 'prime candidates' for the spread of the virus, have had to impose onerous lockdowns and restrictions that have made the incarceration of

prisoners far harsher than normal.); United States v. Ramirez, No. 20 Cr. 29 (JPO), ECF
No. 47 at 19 (S.D.N.Y. October 20, 2020)(Oetken, J.) (calling pretrial detention during
the pandemic "really harsh" and "probably twice as punitive as it would otherwise be");
see, also, United States v. Hendryx, No. 18 Cr. 478 (ENV), ECF No. 40 at 23 (E.D.N.Y.
May 20, 2020)(granting variance in part because of "special horrors" that the disease
"visited on the congregate facilities").

      In custody at MCC from his June 12, 2019 arrival in the United States until it
closed in late September 2021, Mr. Kromah endured three extended lockdowns in his 11'
x 5' cell for all but 15 minutes in every 24 hours – from February 28, 2020 to June 20,
after which it was open for a single week before locking down again until August 21,
2020. Having been locked down in MDC until June, 2022, Mr. Kromah served the
entirety of the pandemic locked down in a foreign country, without family contact, in a
state of high anxiety about his vulnerability to the virus. Mr. Kromah, too, should be so
credited. The Court acknowledged as much in its March 12, 2021 sentencing of the
defendant in United States v. Rivera, 17-290. Mr. Kromah is afflicted with ADHD. See
February 10, 2021 Order (noting the February 5th, 2021 death of a 46-year-old prisoner
from COVID-19 at the MDC). Late last year, he caught COVID and suffered all the
symptoms, essentially without medical care. Mr. Kromah also experienced terrible back
pain caused by L5-S1 Facet Arthropathy at MDC, which in turn resulted in the
exacerbation of his sciatica in both of legs. He was in such agonizing pain but was
repeatedly denied medical attention at MCC, that is until Judge Woods intervened and
ordered that he receive medical attention for his back pain in 2021. During his stay at
MCC, Mr. Kromah was involved in the fire of December 8th, 2019, which saw inmates,
including himself, taken to the roof of the prison in the early morning, in temperatures
that were below 20 degrees Fahrenheit, in little more than their pajama clothing. In these
circumstances a month for month credit for the 30 months he did in pandemic-style
pretrial detention does not seem greedy. On the whole, Mr. Kromah has served a total of
51 months of incarceration on these charges already.

F.     Placement

      The Bureau of Prisons ("BOP") is charged by law with the responsibility for
designating convicted federal defendants to appropriate penal facilities, see 18 U.S.C. §
3621(b), and while the BOP is required to consider a district court's designation
recommendation, among other factors, see id. § 3621(b)(4)(B), the statute does not
require either that district courts make such recommendations or that the BOP follow
those that are made, see United States v. Kromah, 65 F.3d 301, 307 (2d Cir. 1995)
(stating that "sentencing court has no authority to order that a convicted defendant be
confined in a particular facility" because that decision is "within the sole discretion of the
Bureau of Prisons"). Accord Levine v. Apker, 455 F.3d 71, 83 (2d Cir. 2006); Thye v.
United States, 109 F.3d 127, 130 (2d Cir. 1997). Nevertheless, BOP makes every effort to
respect a district court's recommendations so, should the Court deem incarceration
warranted, Mr. Kromah requests that the Court recommend placement in a facility in the
Northeast Region. Mr. Kromah has family in Pennsylvania, near Philadelphia, and would
prefer to be as close to them as possible. See Bureau of Prisons Program Statements PS

9

5140.28 and PS 5070.10 § 7 (a) & (b); <u>United States v. Potoski</u>, 2010 WL 1909551 (09-0176-cr 2d Cir. May 13, 2010) (sentencing court may recommend place of imprisonment) citing <u>United States v. Yousef</u>, 327 F3d 56, 165 (2d Cir. 2003).


G.      <u>Conclusion</u>

For the foregoing reasons, Mr. Kromah respectfully requests that the Court sentence him as suggested herein.




Respectfully submitted,


s/ *Jeff Chabrowe*

Jeffrey A. Chabrowe




cc: AUSA Jarrod Schaeffer
    Probation Officer Pamela Flemen